## SUSANNA MILLER v. JOHN PELZER AND ANOTHER.[1]

May 23, 1924.

No. 23,893.

**Complaint insufficient to show any violation of legal duty.**

Plaintiff was born out of wedlock and shortly thereafter taken into the home of defendants, who, for a valuable consideration paid by the county, agreed to keep and care for plaintiff until she became 18 years of age. She remained in defendants' home 25 years, and now alleges that defendants by deceit and fraud failed to disclose to her at 18 years of age the truth as to her parentage and that she did work for defendants for 7 years worth $2,500, and that she has been damaged in that amount. *Held* that the facts fail to show a violation of any legal duty and hence the complaint does not state facts sufficient to constitute a cause of action.

[1]Reported in 199 N. W. 97.

Action in the district court for Olmsted county to recover $2,500. From an order, Callaghan, J., sustaining defendants' demurrer to the complaint, plaintiff appealed. Affirmed.

*M. D. Halloran,* for appellant.

*Burt W. Eaton,* for respondent.

WILSON, C. J.

Demurrer to a complaint was sustained by trial court and plaintiff has appealed. Plaintiff, in her complaint, alleges that defendants are husband and wife; that on July 15, 1887, plaintiff was born out of lawful wedlock, and shortly thereafter defendants took her into their home, and, for a valuable consideration paid them by Olmsted county, defendants agreed to keep and care for plaintiff until she became 18 years of age; that, pursuant to this arrangement plaintiff entered the home of the defendants in the year 1887, and she lived there continuously until May 1, 1912, when she married. That during these 25 years she was known as Susanna Pelzer. That during this period, defendants, with intent to deceive her, led her to believe and she did believe, that she was defendants' natural child. That between July 15, 1905, when plaintiff became 18 years of age, and May 1, 1912, plaintiff performed a woman's work in the house and a man's work in the field, all on defendants' farm, as directed by defendants, and that such work was of the value of $2,500. That during said time, and prior thereto and thereafter, plaintiff has given to defendants a daughter's attention, love and service and has sacrificed her time, energy, strength and devotion for them and deprived herself of entertainment, pleasure and opportunity of marriage, believing that she was their natural daughter, which belief they intentionally encouraged and sustained, with the intention of deceiving the plaintiff, and through their deceit and fraud and their wilful and intentional acts they have wrongfully deceived the plaintiff and defrauded her to her great damage. That defendants never told plaintiff she was not their daughter, but in May, 1921, she learned from others that she was not their child, and at this time she learned of the alleged deceit and fraud prac-

ticed upon her. That plaintiff has been damaged in the sum of $2,500.

Insofar as this complaint attempts to allege the element of failure to marry because of the alleged fraud and deception, it is insufficient, because it fails to state with any certainty any opportunity which was rejected because of performance of the supposed duty to defendants. It is too general and indefinite in this respect. The complaint, however, as we construe it, sufficiently alleges that, because of such alleged fraud and deception, defendants procured labor and services from plaintiff, and that she has been damaged by this alleged silent deception and fraud.

This action sounds in tort. If the facts disclosed constitute a cause of action, it must be upon the theory that defendants violated a legal duty in concealing from plaintiff, when she arrived at her majority, the truth concerning her paternity. Did they, under the circumstances, owe her a legal duty to make such disclosure to her?

The defendants and plaintiff lived in the relation of parents and child for a quarter of a century. They were a major part of a family. The family relation was, by plaintiff, believed to exist, and the defendants safely guarded the secret and treated plaintiff in such a way that she apparently had no reason to doubt but that defendants were her natural parents. Upon arriving at majority, plaintiff continued in this family as a member thereof just the same as she had before. This family relation for all practical purposes was just a sacred as if plaintiff had been the natural daughter.

The peace of society, and of the families composing society, and a sound public policy, designed to subserve the repose of families and the best interests of society, forbid to the minor child a right to appear in court in the assertion of a claim to civil redress for personal injuries suffered at the hands of the parent. An unkind and cruel parent may and should be punished at the time of the offense, if an offender at all, by forfeiting custody and suffering criminal penalties, if need be; but for the minor child who continues, it may be for long years, at home and unemancipated, to bring a suit, when arrived at majority, free from parental control and under counter-influence, against his own parent, either for

services accruing during infancy or to recover damages for some stale injury, real or imagined, referable to that period, appears quite contrary to good policy.  Taubert v. Taubert, 103 Minn. 247, 114 N. W. 763; Roller v. Roller, 37 Wash. 242, 70 Pac. 788, 68 L. R. A. 893, 20 R. C. L. 631; Hewlett v. George, 68 Miss. 703, 9 South. 885, 13 L. R. A. 682; McKelvey v. McKelvey, 111 Tenn. 388, 77 S. W. 664, 64 L. R. A. 991, 102 Am. St. 787, 1 Ann. Cas. 130. Our language goes beyond the circumstances of this case, but it goes to the extent of barring an action because of a tort after the minor has reached majority and the injury sued on is referable to the period of minority, and it shows the tendency of the courts to avoid commercializing the family relation.  This principal by analogy or parity of reasoning is worthy of consideration in solving the inquiry now before us.

Family settlements are favored in the law, and the good of society requires that the family relation be preserved, protected and encouraged, and an occasional misfortune to one who has a grievance of this character is of far less importance than to establish a precedent which will open wide the gates for litigation affecting the family relation.  The criminal law is always available to one who is the subject of a criminal offense.

In the instant case plaintiff continued in her relations with defendants for 7 years after arriving at 18, and she now asserts that it was the legal duty of respondents on her eighteenth birthday to disclose to her the fact that she was not their natural daughter. True, when plaintiff reached her majority the contract of defendants with the county was performed, and plaintiff then, in law, was free to go her way.  This was true even if she had been a natural daughter.  She was permitted to continue as a member of the family, though she was not compelled to do so.  It is well if she has been taught the habit of industry.  By what course of logic are we to conclude that she would have been better served by being then told the truth?  An affirmative answer to this inquiry calls for a harsh conclusion as to the benefits of home influence which we are not inclined to treat lightly.  In fact, the home—the family relation—is of such vast importance that its benefits cannot be esti-

mated. Defendants might well reason that they were saving her peace of mind and worry by remaining silent. Insofar as she was concerned, her illegitimacy was neither disgraceful nor ignominious, and yet in the face of an undeserving tendency of society she could have no pride in the fact that she was of unknown parentage. Defendants were doubtless aware of the fact that society is sometimes cruel, and we are justified, from the facts stated in the complaint, in concluding, as we do, that defendants' silence, now complained of, was prompted more by a kindly and considerate feeling for the plaintiff than because of any thought on their part to advance their material welfare. There are many children in the state who come from maternity hospitals, orphan homes and other institutions, and we take judicial notice of the fact that those in charge and directing the policies of such institutions, advocate a concealment of the natural parent when the child has assumed the relation of a child to another. In the face of such a well-recognized practice, supported, we believe, by reason and the experience of social workers, we are reluctant to say that it is the legal duty of a foster parent to affirmatively disclose to such child the truth as to his parentage or even to the extent of advising that he is not thei· natural child. Whether the child should be informed in respect to such matters is largely within the discretion of the foster parents. We are of the opinion that the inquiry must be answered in the negative.

We do not find any authority upon the question now before us. It may be possible for facts to exist that would permit the prosecution of an action sounding in tort by one in the ·osition of plaintiff against a foster parent when the cause of a· .ion arises out of facts occurring after the child has reached majority. Graham v. Stanton, 177 Mass. 321, 58 N. E. 1023; Clasen v. Jruhs, 69 Neb. 278, 95 N. W. 640, 5 Ann. Cas.· 112; Cooper v. Cooper, 147 Mass. 370, 17 N. E. 892, 9 Am. St. 721; Schrimpf v. Settegast, 36 Tex. 296. The facts alleged in this complaint do not do so. Mere silence, as it is alleged in this case, is not sufficient to constitute actionable fraud under the circumstances disclosed by the complaint. The facts alleged do not show the violation of any legal duty. Her legal rights have not been invaded.

Order affirmed.